STATE and JOSEPH S. DIVER v. CITY OF MIAMI.

152 So. 6.
En Banc.
Opinion Filed December 19, 1933.
Rehearing Denied January 22, 1934.

*F. P. Fleming* and *H. A. Kooman,* for Appellants;

*J. W. Watson, Jr.,* and *Mitchell D. Price* and *Charles W. Zaring,* for Appellee.

DAVIS, C. J. —This proceeding was brought by the City of Miami under Sections 5106-5112, C. G. L. 3296-3302, R. G. S., for the validation of certain Water Revenue Certificates proposed to be issued by it under authority of Section 3 (7) of the Charter of Miami* as amended by Chapter 16561, Acts of 1931, Laws of Florida. The lower court entered a decree confirming and validating such cer-

---

*The Charter of Miami is embraced in Chapter 10847, Special Acts 1925, as amended by Chapters 11616, 11617, 11618, Special Acts 1925, Special Session, and Chapters 13096, 13097, 13098, Special Acts 1927, and Chapters 14229 and 14234, Special Acts 1929, and Chapters 14616 and 14617, Special Acts 1929; Chapters 15338, 15339, 15341, 15342, 15344, 15340, Special Acts 1931; Chapters 15686 and 15687, Acts of 1931, First Special Session; Chapter 15821, Acts of 1931, Second Special Session; Chapters 16558, 16559, 16560, 16561, 16554, 16555, 16556 and 16557, Special Acts 1933.

tificates and the State of Florida, statutory defendant below, and Joseph S. Diver, an intervening taxpayer, have prosecuted this, their joint appeal, from the validation decree.

The Water Revenue Certificates involved were proposed to be issued under an emergency ordinance designated as No. 1100, adopted by the City Commission as such under date of October 2, 1933. The purpose of the issue was to realize moneys to pay for constructing certain additions, replacements and improvements to the city owned water supply system. This was to be done by making the proposed certificates payable solely from the net revenue of the combined present water supply system and the proposed improvements. It is conceded on the record by all parties that the city's proposal is to issue the certificates without submitting the proposal therefor to the freeholders of Miami for approval under Section 6 of Article IX of the Constitution of Florida as amended in 1930.

Sections 5106 C. G. L., 3296 R. G. S., *et seq., supra,* provide that any municipality, desiring to incur "any bonded debt, or to issue certificates of indebtedness" shall have the right, if it deems it expedient, to determine its authority to incur bonded debt, or to issue certificates of indebtedness, and the legality of all proceedings taken or had in connection therewith, by filing a petition against the State of Florida in the Circuit Court of the County, pursuant to which a full hearing is provided for at which the municipality's authority for incurring such bonded debt, or for issuing such certificates of indebtedness, as a matter of law and fact, may be judicially investigated, and all propositions of controverted law and fact set at rest by a conclusive adjudication as to the validity of bonds, or certificates of indebtedness, prior to their issue by the affected municipality.

At the threshold of the present case the proposition is

suggested by counsel for appellants to the effect that the statutory proceedings under the sections of our statutes above referred to are applicable only to bonded debts or certificates of indebtedness which are the legal equivalent of bonds; that inasmuch as it is contended by the City of Miami in the present case that the proposed "Water Revenue Certificates" are in no sense evidences of municipal debts or bonds, nor the legal equivalent thereof under the Constitution and laws of this State, that if such contention be sustained by this Court, that it can only result in a dismissal of the present proceeding for want of jurisdiction because the validation statute does not authorize proceedings to validate anything except bonds or certificates of indebtedness. On the other hand, it is suggested by the appellants that if the proposed "Water Revenue Certificates" are in law and in fact either "bonds" or "certificates of indebtedness' within the purview of Sections 5106 C. G. L., *et seq., supra,* that then the decree of validation must be reserved on its merits, because in the last mentioned circumstance, such proposed "Water Revenue Certificates" would either impose on the City of Miami a debt liability in excess of its maximum debt limit, or constitute a bonded debt not created nor authorized by the approving vote of the city's freeholders as provided in the Constitution for the "issuance" of bonds.

Our conclusion on the proposition of jurisdiction is that the statutory proceedings for validation of bonded debts and certificates of indebtedness authorized by the sections to which reference has heretofore been made, are broad enough to include every form of *proposed* bonded debt, as well as every form of *proposed* certificate of indebtedness, negotiable or non-negotiable, limited or general, which a county, municipality, taxing district, or other political sub-

division or district *may undertake to issue* under purported authority of law.

The purpose of the statutory validation proceedings is to provide a forum and a course of legal procedure to which any county, municipality, taxing district, or other political district or subdivision may resort for the purpose of determining whether or not any proposed obligation *in the form of* a bonded debt, or *in the form of* a certificate of indebtedness, may be validly issued by it in the *form* proposed in its ordinance, resolution or other action taken under the law as the initiatory step for issuance of an obligation of that character. And in every such proceeding it is the intent of the statute that such judicial investigation of the pleaded validation proposal shall be made, that the court may determine therefrom whether or not that which is pleaded as petitioner's proposal, is within the legal authority of the petitioner to do, so that if it be adjudged valid, the validity thereof shall never again be subject to be called in question in any court of this State. See Section 5109 C. G. L., 3299 R. G. S.

Jurisdictional facts pleaded in good faith constitute the test of jurisdiction. Hutchinson v. Courtney, 86 Fla. 556, 98 Sou. Rep. 582. So whether the proposed *form* of bonded debt, or the proposed *form* of certificate of indebtedness, be actually of the character that may be validated in and by the particular validation proceedings taken under the law or not, the appropriate assertion in such judicial proceedings, of the validity of what is involved in a validation petition filed under the statute, coupled with the affirmation of petitioner's proposal to issue bonds or certificates in the *form* set forth, and under the circumstances narrated in the validation petition, is sufficient to invoke the jurisdiction of the Circuit Court to *investigate and determine,*

as to all questions of law and fact raised or that may be raised under the pleadings, the legality of what is proposed, whether the proposal itself be ultimately adjudicated to be within the competency of the petitioner's powers or not.

Thus the statute has been held applicable to a proceeding instituted for the validation of time warrants. Hubert v. City of Vero Beach, 93 Fla. 323, 112 Sou. Rep. 52. And on a like principle, we hold that the jurisdiction of the Circuit Court conferred by the validation statute, has been properly invoked in a case like the present, where it is made to appear in the petitioner's validation petition that what are claimed to be legally authorized certificates of indebtedness, although the certificates are of a peculiar, special or limited character, are the subject of the city's prayer for validation and confirmation.

Turning now to the merits of the case as presented by the issues joined between the appellant, Diver, the intervening taxpayer, and the City, we find that the facts disclosed by the record are in substance that the City of Miami had long prior to the proposed issuance of the water revenue certificates here brought in controversy, constructed for itself by means of a city bond issue, a water supply system at a cost of $1,850,000.00, of which amount $1,745,000.00 is still unpaid; that the city does not undertake to directly distribute water in the city, but has contracted through a franchise agreement with a private corporation for profit, Miami Water Company, to distribute water to consumers; that under such contract it has been provided that the Miami Water Company should collect for the city from consumers, and pay over to the city, as payment for the water supplied such surcharges as the city might fix; that it has been further provided that such surcharges shall be no more, however, than may be sufficient to pay operating expenses, interest, amortization and depreciation on

the water supply system constructed and owned by the city; that under the proposal for issuance of the Water Revenue Certificates, herein sought to be validated and confirmed, the city plans to divert and use part of the proceeds of its aforementioned surcharges to pay for needed replacements, repairs, improvements and additions to the water supply system; that this is being done by the city in order to insure its ability to perform its contract with the Miami Water Company, which contract was entered into in the year 1925 and binds the city for the full period of Miami Water Company's thirty years franchise, as the distributor, to deliver to that company, without cost or expense to the distributor therefor, all the water necessary or requisite for, or in connection with, the distribution of water under said company's franchise; that heretofore the amount of the net revenues accruing to the City of Miami from its water supply service, has ranged from $62,360.00 in 1930 to $91,070.34 in 1933; that the present water supply facilities were constructed largely of wooden materials, which are now in an almost complete state of disintegration; that unless the present decadent lines are replaced with new material sufficient to withstand the distributor's requirements as to water volume and pressure, that such existing facilities are in imminent danger of sudden and irreparable collapse; that the total estimated cost of constructing the repairs, replacements and improvements contemplated to be made to the existing water supply system, is the sum of $560,000.00; that this amount the city, as proprietor of the existing water supply system, can raise by no other effectual or legal means than by funding its contemplated water revenues it anticipates receiving from said water system, beginning with those anticipated for the year 1934 and ending with the year 1943, same to be funded at four per cent.

interest; that although the net proceeds heretofore derived
from the city's water revenues have been each year appro-
priated and used for general revenue purposes of the City
of Miami, which has to that extent reduced *ad valorem*
taxation thereby, yet such water revenues have never been
actually pledged for that purpose, nor have they been per-
manently appropriated for any such purpose; that in con-
sequence of their unpledged and unappropriated character,
all such net revenues are now available to be expended at
the discretion of the city, either for the benefit of its ex-
isting water supply system from year to year, as well as
for any general municipal purpose for which a revenue
appropriation would be authorized; that the proposed di-
version of this total of $560,000.00 net water revenues, to-
gether with an additional amount to be drawn from the
same source to cover the interest agreed to be paid thereon
(in the event the revenues diverted are funded in the form
of the proposed interest-bearing water revenue certificates)
is without any contractual undertaking that the City of
Miami shall pledge its general taxing power to guarantee
the making up of deficits, if any, in such yearly anticipated
water revenues, nor is it contemplated that any tax levy,
or appropriation of tax money, shall ever be made to pay
said water revenue certificates, or provide for their pay-
ment at maturity, if payment out of the anticipated water
revenues is not realized as expected; that although the di-
version of these water revenues from the general funds of
the city will result in a proportionate increase of *ad valorem*
taxation on property owners to make up the diverted reve-
nue, yet this, it is claimed, is nothing more than would be
the result if the city directly expended such funds annually
for the identical purpose, without undertaking to fund the
same in order to make the proposed expenditures available
in a lump sum; that the proposition involved is simply a

funding of the water revenues and not of taxes; that because of this, the provisions of Section 6 of Article IX of the Constitution of Florida, as amended, as well as the Miami Charter debt limitation, have no application to the presently proposed funding arrangement which is not being undertaken as a means of raising additional municipal moneys in lieu of a direct municipal bond issue, but is being undertaken solely for the purpose of preserving and increasing the efficiency of the water supply system which produces such water revenues, by investing such revenues as a capital expenditure in an essential repair and betterment of the water supply plant itself.

There is respectable authority (perhaps the weight of authority is to this effect) which affirms the proposition that municipal obligations, which are not payable from taxes, but are provided to be payable solely from the revenues of an independent revenue producing asset or utility, do not constitute a debt of the municipality, within the prohibition of a constitutional or statutory debt limit. Alabama State Bridge Corp. v. Smith, 217 Ala. 311, 116 Sou. Rep. 695; *In re*: Opinion of the Justices, 226 Ala. 18, 145 Sou. Rep. 481; Mississippi Valley Power Co. v. Board of Improvement, 185 Ark. 76, 46 S. W. Rep. (2nd) 32; McCutcheon v. City of Siloam Springs, 185 Ark. 846, 49 S. W. Rep. (2nd) 1037; California Toll Bridge Authority v. Wentworth, 212 Cal. 298, 298 Pac. Rep. 485; Shelton v. City of Los Angeles, 206 Cal. 544, 275 Pac. Rep. 421; California Toll Bridge Authority v. Kelly (Cal. Sup.), 21 Pac. Rep. (2nd) 425; Shields v. City of Loveland, 74 Colo. 27, 218 Pac. Rep. 913; Fox v. City of Bicknell, 193 Ind. 537, 141 N. E. Rep. 222; Klein v. City of Louisville, 224 Ky. 624, 6 S. W. Rep. (2nd) 1104; Bloxton v. State Highway Commission, 225 Ky. 324, 8 S. W. Rep. (2nd) 392; Estes v. State Highway Commission, 235 Ky. 86, 29 S. W. Rep.

(2nd) 583; Williams v. City of Raceland, 245 Ky. 212, 53 S. W. Rep. (2nd) 370; Kelly v. City of Minneapolis, 63 Minn. 125, 65 N. W. Rep. 115; Fanning v. University of Minnesota, 183 Minn. 222, 236 N. W. Rep. 217; Bell v. City of Fayette, 325 Mo. 75, 28 S. W. Rep. (2nd) 356; State ex rel. Smith v. City of Neosho, 203 Mo. 40, 101 S. W. Rep. 99; Barbour v. State Board of Education, 92 Mont. 321, 13 Pac. Rep. (2nd) 225; State v. Regents of University of New Mexico, 32 N. M. 428, 258 Pac. Rep. 571; Lang v. Cavalier, 59 N. D. 75, 228 N. W. Rep. 819; State v. Davis, 59 N. D. 191, 229 N. W. Rep. 105; Kasch v. Miller, 104 Ohio St. 281, 135 N. E. Rep. 813; Butler v. City of Ashland, 113 Ore. 174, 232 Pac. Rep. 655; McClain v. Regents of University, 124 Ore. 629, 265 Pac. Rep. 412; Barnwell v. Matthews, 132 S. C. 314, 128 S. E. Rep. 712; Winston v. City of Spokane, 12 Wash. 524, 41 Pac. Rep. 888; Uhler v. City of Olympia, 87 Wash. 1, 151 Pac. Rep. 117, 152 Pac. Rep. 998; Griffin v. City of Tacoma, 49 Wash. 524, 95 Pac. Rep. 1107; Faulkner v. City of Seattle, 19 Wash. 320, 53 Pac. Rep. 365; Twitchell v. City of Seattle, 106 Wash. 32, 179 Pac Rep. 127; Schooley v. City of Chehalis, 84 Wash. 667, 147 Pac. Rep. 410; Dean v. City of Walla Walla, 48 Wash. 75, 92 Pac. Rep. 895; State ex rel. State Capitol Committee v. Clausen, 134 Wash. 196, 235 Pac. Rep. 364; Bates v. State Bridge Commission, 109 W. Va. 186; 153 S. E. Rep. 305; Burnham v. City of Milwaukee, 98 Wis. 128, 73 N. W. Rep. 1018; Connor v. City of Marshfield, 128 Wis. 280, 107 N. W. Rep. 639; Loomis v. Callahan, 196 Wis. 518, 220 N. W. Rep. 816.

Other cases limit the doctrine to those obligations only which do not undertake to pledge any of the existing revenues of a plant or other revenue producing asset *in esse*, while some of the cases held that the foregoing distinction

is not applicable to obligations for extensions and additions, when made payable from the gross income of the enlarged plant or other revenue producing asset of the municipality. McCutcheon v. City of Siloam Springs, 185 Ark. 846, 49 S. W. Rep. (2nd) 1037; Department of Water & Power v. Vroman (Cal.), 22 Pac. Rep. (2nd) 698; Searle v. Town of Haxtun, 84 Colo. 494, 271 Pac. Rep. 629; Shields v. City of Loveland, 74 Colo. 27, 218 Pac. Rep. 913; Maffit v. City of Decatur, 322 Ill. 82, 152 N. E. 602; Ward v. City of Chicago, 342 Ill. 167, 173 N. E. Rep. 810; City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. Rep. 1004; Jones v. City of Corbin, 227 Ky. 674, 13 S. W. Rep. (2nd) 1013; McCann v. Morgan City, 173 La. 1063, 139 Sou. Rep. 481; Carr v. Fenstermacher, 119 Neb. 172, 228 N. W. Rep. 114; Seward v. Bowers, 37 N. M. 385, 24 Pac. Rep. (2nd) 253; Brockenbrough v. Board of Water Commissioners of City of Charlotte, 134 N. C. 1, 46 S. E. Rep. 28, Pathe v. Donaldson, 29 Ohio App. 17, 163 N. E. Rep. 204; Cathcart v. City of Columbia, 170 S. C. 362, 170 S. E. Rep. 435; Sowell v. Griffith, (Tex. Com. App.) 294 S. W. Rep. 521; Womack v. City of West University Place (Tex. Civ. App.) 32 S. W. Rep. (2nd) 930; Barnes v. Lehi City, 74 Utah 321, 279 Pac. Rep. 878; State *ex rel.* Dunbar v. Board of Trustees, 148 Wash. 126, 268 Pac. 862; Griffin v. City of Tacoma, 49 Wash. 524, 95 Pac. Rep. 1107; City of Jerseyville, Ill., v. Connett (C. C. A.), 49 Fed. Rep. (2nd) 246.

A third group of cases refuses to acknowledge any such distinction at all.* The last mentioned group holds that to permit a city to *borrow* any money under a contractual device for its repayment with interest, even though it is

---

*Some of these cases have been overruled by later decisions of the same court.

expressly provided therein that the municipality shall not be liable generally for its. repayment, but that the lender shall look solely to pledged municipal property or assets, or the income thereof, as security, in effect annuls the intended constitutional, or statutory, restriction on municipal improvidence; and is therefore void as an indirect attempt to strike down an intended safeguard against municipal profligacy. These cases regard any form of revenue anticipation borrowing as an unlawful attempt to circumvent the debt or borrowing restrictions of the statute or Constitution, which are to be regarded as intended for the purpose of forbidding imposition of additional burdens on the taxpayer, either by diverting funds which must be replenished by other funds raised by taxation if so used, or otherwise made up out of moneys which would be available for reducing taxation if not diverted. Baltimore v. Gill, 31 Md. 375; Hight v. City of Harrisonville, 328 Mo. 549, 41 S. W. Rep. (2nd) 155; City of Campbell, Mo., v. Arkansas-Missouri Power Co. (C. C. A.), 55 Fed. (2nd) 560; Hesse v. City of Watertown, 57 S. D. 325, 232 N. W. Rep. 53; City of Joliet v. Alexander, 194 Ill. 457, 62 N. E. Rep. 861; Garrett v. Swanson, 216 Cal. 220, 13 Pac. Rep. (2nd) 725; Wilder v. Murphy, 56 N. D. 436, 218 N. W. Rep. 156; Morton v. City of Waycross, 173 Ga. 298, 160 S. E. Rep. 330; Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. Rep. 462; Voss v. Waterloo Water Co., 163 Ind. 69, 71 N. E. Rep. 208; Newell v. People, 7 N. Y. 9; Leonard v. City of Metropolis, 278 Ill. 287, 115 N. E. Rep. 813; Lesser v. Warren Borough, 237 Pa. 501, 85 Atl. Rep. 839; Feil v. Coeur D'Alene, 23 Idaho 32, 129 Pac. Rep. 643; Miller v. City of Buhl, 48 Idaho 668, 284 Pac. 843; Zachary v. City of Buhl, 48 Idaho 665, 284 Pac. Rep. 843; Zachary v. City of Wagoner, 146 Okla. 268, 292 Pac. Rep. 345; City of Tecumseh v. Butler, 184 Okla. 151, 298 Pac. Rep. 256;

Browne v. City of Boston, 179 Mass. 321, 60 N. E. Rep. 934; State v. Portage, 174 Wis. 588, 184 N. W. Rep. 376.

Section 6 of Article IX of the Constitution of Florida (as amended at the 1930 General Election) reads as follows:

"Section 6. The Legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, and the counties, districts or municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such counties, districts, or municipalities shall participate, to be held in the manner to be prescribed by law; but the provisions of this Act shall not apply to the refunding of bonds issued exclusively for the purpose of refunding of the bonds or the interest thereon of such counties, districts or municipalities. (Amended, Senate Joint Resolution 26, Acts of 1929; adopted at General election of Representatives held November 4, 1930.)"

This section either in its original, or in its amended form, has been considered by this Court, and construed in the following cases: Advisory Opinion to Governor, 94 Fla. 967, 114 Sou. Rep. 850; Amos v. Mathews, 99 Fla. 1, 126 Sou. Rep. 308; Martin v. Dade Muck Land Co., 95 Fla. 530, 116 Sou. Rep. 449; State v. City of Miami, 100 Fla. 1388, 131 Sou. Rep. 143; Sullivan v. City of Tampa, 101 Fla. 298, 134 Sou. Rep. 211; Sholtz v. McCord, 112 Fla. 248, 150 Sou. Rep. 234; Herbert v. Thursby, 112 Fla. 826, 151 Sou. Rep. 385.

Appellant Diver contends that under Section 6 of Article IX of the Constitution as above quoted, the constitutional prohibition is broader than one which merely forbids or limits the incurring of municipal debts, in that the very lan-

guage of the Constitution itself places a specific restriction upon the power "to issue bonds." This phrase, "to issue bonds," appellant contends, refers to and includes a prohibition not only against creation of any interest bearing contractual indebtedness to be paid out of future taxes, but prohibits the issue of *any other form* of municipal interest bearing paper securities, negotiable or not negotiable, which evidences an obligation to be paid out of future municipal revenues, unless the same are authorized by vote of a majority of the freeholders approving same.

Without at this time undertaking to define the precise scope of our own constitutional prohibition against the issuance of municipal bonds without a vote of the freeholders, and eschewing any attempt to reconcile and approve for application in the State of Florida the varying and conflicting holdings of any one of the cases which have been cited to us from other jurisdictions, as being persausive in the formulation of some definite ruling here on the subject of municipal revenue obligations which are not payable from taxes, but are payable only from special revenues, we do not at this time undertake to declare just what should be considered as not constituting municipal "bonds" within the intendment of Section 6 of Article IX, *supra*. We regard the sole proposition of law to be decided on the present appeal as whether or not, acting under special legislative authority given it so to do, a city owning, in a proprietary or corporate capacity, a water supply system from which it derives annually unpledged net revenues, which it is admittedly duly empowered to expend, as and when received by it, for the purpose of repairing, enlarging, extending and improving the water system it owns, may, by means of water revenue anticipation certificates, binding solely and only in the nature of debentures on the special water revenues to be realized, and not constituting a direct,

indirect, nor contingent pledge or obligation of the municipality's taxing power, presently *fund* the anticipated revenues, by borrowing the present value of ten years' anticipation thereof, to be repaid with interest solely out of the revenues anticipated, under contractual terms which affirmatively negative any and all legal obligation on the part of the municipality for the payment of the same as an indebtedness against anything except the special fund to be made up of the revenues pledged, if, when and as realized and available for that purpose.*

In construing and enforcing Section 6 of Article IX of the Constitution of this State, this Court has consistently recognized and followed, and will continue to adhere to, the rule of constitutional law which regards the substance, rather than the form of things. If any other rule were observed, the real purpose of the constitutional restriction might be effectually violated, or the intendments flowing therefrom lost sight of, in the fashion in which a given result contrary to the purposes of the Constitution might be attempted to be brought about.

So in deciding whether a given proposition is in violation of a constitutional limitation such as has just been referred to, the result attempted to be brought about by what is proposed, is the prime consideration. And the controlling test with reference to it is to be found by regarding substance rather than form in looking at its practical operation and effect when considered in the light of the constitutional restriction against improvident borrowing which the organic

---

*It will be noted that this is a decidedly different proposition from a proposal to borrow money for some general municipal purpose by resorting to a pledge of specific municipal assets, or some special municipal non-tax income, merely as a substitute for the pledging of the city's taxing powers such as would ordinarily be done for customary municipal borrowing.

law obviously intended to impose in the premises. Bailet v. Drexel Furniture Co., 259 U. S. 20, 66 L. Ed. 817, 42 Sup. Ct. Rep. 449, and cases cited.

The 1930 amendment to Section 6 of Article IX of the Constitution introduced into the fundamental law for the first time, a stated limitation on the issuance of bonds by *counties, municipalities and districts.* Therefore the subject of issuing bonds was rigidly safeguarded as to improvidence on the part of the State itself, but wholly unregulated as to local taxing units.

But the amendment to the Constitution was adopted in the light of a long established State policy on the part of a large number of municipalities to acquire and operate, in a proprietary capacity, their own public utilities such as water, light and gas plants, from which revenues accrued to them in the nature of returns from what is in its essential character a purely corporate undertaking owned and managed by the municipality for the benefit of its inhabitants. That business enterprises in the nature of public utilities, although owned and operated by a municipal corporation, have many attributes of a private business enterprise, and are subject to most of the same rules of law, is expressly recognized in this State.\* The practice of owning and operating public utilities as engaged in by municipalities, was well known to the Legislature and to the people of this State when amended Section 6 of Article IX was adopted. Consequently such amendment must be construed as having been passed by the Legislature, and ap-

---

\*For example, in City of Sebring v. Avant, 95 Fla. 960, 117 Sou. Rep. 383, the hazardous occupation statute was applied to cities engaged in the "business" of producing and selling electricity. The statutes of the State have also imposed excise taxes on such utilities without discrimination as to the municipal character of same and these have been sustained by this Court as valid.

proved by the electorate, in the light of the acknowledged municipal system prevailing in this State with reference to local public ownership and operation of public utilities, or public services in the nature of utilities.

Such being the circumstances under which the Constitution was amended, it seems clear that the restrictions imposed on municipalities against the issuance of bonds without an approving vote, have no application to that form of municipal financing required to be done in order to keep municipal utilities in operation. So long, therefore, as such financing is limited to the borrowing of money solely on the security of anticipated utility revenues, when the object of the borrowing and the contemplated purpose or intended use of the borrowed funds, is confined strictly to a reinvestment of the same in the existing plant through which such funds have been earned, in order to make it more efficient or economical in operation, or to enlarge its usefulness to the municipality, the borrowing is not prohibited by the Constitution.

We reach this conclusion by looking at the substance, rather than the form of such financing, for it amounts to nothing more than a conversion of the prospective earnings into a capital investment, whether the earnings are presently funded or not.

There is nothing in either the language or background of Section 6 of Article IX of the Constitution of Florida, as now amended, to suggest the idea that when the Constitution was changed so as to prohibit the "issuance of bonds" by a city without a vote of its freeholders, that the change was intended to be so applied as to, in effect, transfer the fiscal management and control of proprietary earnings derived from a city's self-supporting revenue-producing utilities, from the experienced judgment of those vested with the authority of corporate conduct, to the uncertain

decision of a municipal election called to determine the purely business proposition whether or not a surplus in revenues is to be so used as to better equip or enlarge the facilities producing such earnings.*

The "Water Revenue Certificates of the City of Miami, Florida," with interest coupons attached, which under the statute have been validated by decree of the Circuit Court here appealed from, do not in terms or legal effect constitute a binding, continuing, interest bearing contract obligation of the city to pay money in the future from funds derived from any form of taxation, or from any revenues derived from the sale, lease or operation of facilities or other property belonging to or held by the city for governmental purposes, or from the revenues derived generally from the operation of utilities, or other property belonging to, or held or operated by, the city in its corporate or proprietary authority as may be provided for by law.

Such certificates and coupons if duly issued will obligate

---

*In the present case the record shows that at the time the constitutional amendment of 1930 was adopted, the City of Miami was then under the definite, enforceable obligation of a long term franchise contract which bound it to provide water to a distributor. That the city may be disabled from fulfilling its agreement unless it reconstructs its water lines now about to disintegrate through age and decay, is not challenged. To hold that the proposition of using the revenues from the water plant itself to keep the water plant going is a matter which must be submitted to the chance result of a vote of freeholders, whose self-interest in the reduction of taxes may cause them to vote a denial of authority to fund the revenues for plant purposes, is to hold that the existing contract between the water company and the city could be indirectly impaired by this method, since submission to a vote would imply the right of voters to vote against the use of revenues for such purposes, and thereby handicap corporate managerial discretion to take steps necessary to perform the city's water supply contract.

the city to pay at designated times stated amounts "solely from the special fund," as provided, under the express conditions and limitations stated in the authorizing resolution adopted by the City Commission under authority of the designated statute applicable thereto, and will afford no basis for recovery of a judgment at law, or decree in equity thereon, except a judgment or decree limited to the special trust fund provided for as a means of payment, the duty to raise which fund from the water revenues is enforceable only by mandamus.

. The statute, the resolution of the City Commission and the Water Revenue Certificates contemplate a loan to the city in its proprietary capacity only, such loan to be used in improvements of the water supply system of the city. This loan is to be repaid solely from the net revenues derived from the operation of the property owned by the city for corporate purposes, and not otherwise, it being expressly provided in Section 9 of the authorizing resolution that "no taxes shall ever be levied and no moneys shall ever be taken or diverted from any funds of the city for the payment of the principal and interest of Water Revenue Certificates issued hereunder, except as hereinabove expressly provided."*

It has been affirmatively made to appear in this case that the Water Revenue Certificates, as validated, do not directly, indirectly, or contingently, obligate the city to levy or to collect any form of taxation whatever therefor, or to

---

*The concluding words, "except as hereinabove expressly provided," in Section 9 of the resolution were regarded by the court below, and are regarded by this Court, as eliminated as meaningless and inoperative, because contrary to the powers of the city in the premises, which assumed to act without in any respect pledging or obligating the city's taxing powers, when it did not submit the revenue certificates provided for, to a vote of the freeholders.

make payments thereon from city taxation, or from general corporate funds, or to assume any obligation whatever except to impose a sufficient charge for the water service rendered to patrons and customers by the use of particularly designated property, and to apply to the payment of such certificates the net proceeds from the operation of the particular property which is owned by the city in its proprietary capacity, and which is to be repaired and improved by the use of the proceeds of the sale of the certificates, so as to more efficiently serve the public purpose designed, pursuant to the requirements of the contract under which the property was acquired by the city for the purpose of rendering, for a proper charge, an indispensable public service to the inhabitants of the city.

And as the Water Revenue Certificates are to be issued for a corporate purpose, and are specially made payable solely out of net revenues derived only from the operation of particular proprietary property, which, to meet immediate and imperative public needs, is to be repaired and improved by the use of the money received from the certificates, and no other obligation or liability, express or implied, direct or indirect or contingent or otherwise is assumed or can legally be assumed by or imposed upon the city by the certificates or by the statute or the resolutions or other proceedings upon which the certificates are predicated, the Water Revenue Certificates involved herein, do not directly or indirectly violate the terms or intendments of Section 6 of Article IX of the Constitution of Florida, as amended in 1930, which organic provisions impose limitations upon the power of counties, municipalities and districts in this State to issue bonds.

So the substance of what we decide in this case is that the contemplated certificates of indebtedness issued, or to be issued, by the City of Miami, which are payable out of

the income of proprietary municipal property possessing a fixed earning capacity, to-wit: a municipal water plant, which said property is to be repaired, reconstructed and improved for the necessary preservation of the facilities of the plant, as well as the incidental protection of the public health and public safety, out of the proceeds derived from the sale of such certificates, and which certificates, according to their express phraseology, and according to the statutes and ordinances under which they are authorized and issued, are payable as to both principal and interest solely out of a special fund to be created and established out of the net earnings derived from the operation of said municipal water plant, which constitutes a net revenue derived and to be derived solely from the sale of water, and which certificates do not create, nor purport to create, a general obligation upon, or debt against, the city, and cannot be enforced or collected by levy of an *ad valorem,* or other municipally imposed tax upon property or business transactions situated, or carried on within said City of Miami, or make a charge of any kind upon the property of taxpayers, or upon the tax resource of the City of Miami, are not municipal bonds within the purview of Section 6, of Article IX of the Constitution of the State of Florida, as amended in 1930, nor are they "debts" of the city within the purview of the city's statutory debt limit. Such water revenue certificates are not held to be so exempt from the restrictions of the Constitution because they are designated as "certificates" instead of "bonds," but because of the nature of the actual obligation created thereby, and the manner in which payment is to be made and enforced, as hereinbefore stated.

Validation decree affirmed.

WHITFIELD, ELLIS and BROWN and BUFORD, J. J., concur.

TERRELL, J., concurs in conclusion.

## On Petition for Rehearing.

Per Curiam.—A petition for rehearing and brief in support thereof having been filed in this cause by the appellant, Joseph S. Diver, and oral argument having been permitted thereon, all with special leave of this Court first had and obtained with respect thereto, arguments in support of the petition for rehearing were, on January 16, 1934, duly heard and considered by the Court. Upon full reconsideration of the entire controversy, after briefs and arguments of the parties, this Court has again reached the conclusion that, for the reasons stated in the opinion of this Court filed December 19, 1933, and with the specific qualifications in said opinion set forth, the decree of the Circuit Court appealed from, should stand affirmed as first adjudged, and in consequence thereof that the appellants' petition for rehearing should be denied.

Rehearing denied.

Davis, C. J., and Whitfield, Ellis, Terrell, Brown and Buford, J. J., concur.